THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v RICH-
ARD R. MOREL, Also Known as RICARDO MOREL, Respon-
dent.

Second Department, February 11, 1991

APPEARANCES OF COUNSEL

*Kevin L. Wright, District Attorney (Mary Jane MacCrae* of counsel), for appellant.

*Robert R. Hanley (Thomas F. Purcell* of counsel), for respondent.

## OPINION OF THE COURT

Per Curiam.

The evidence before the Grand Jury in this case reveals that the defendant Richard R. Morel and his wife separated shortly before the birth of their son on April 17, 1987. Pending the resolution of a petition for custody of the child brought by the defendant, the defendant and his wife entered into a stipulation in open court in the Supreme Court, Westchester County, on January 22, 1988, as follows:

"[The defendant's counsel]: * * * The parties will stipulate and agree that Richard Morel will have visitation of the infant child, Michael Morel, on each and every Sunday from the hours of 12:30 P.M. to 3:30 P.M. at a facility called Graymoor, St. Paul's Friary, at Garrison, New York.

"[The defendant's wife's counsel]: Your Honor, in addition to the stipulation, it is the understanding that the physical possession of the child shall remain—

"THE COURT: The custody.

"[The defendant's wife's counsel]: The custody is now joined *[sic]*, but the possession of the child shall remain with the natural mother.

"THE COURT: We don't speak of possession; the physical custody.

"[The defendant's wife's counsel]: The physical custody shall remain without prejudice to either parties' *[sic]* right—shall remain with the natural mother, subject, of course, to visitation * * *

"THE COURT: All right. I assume that the child shall be kept on the grounds of the monastery.

"[The defendant's wife's counsel]: Yes, your Honor, in addition to the parties—we'd stipulate that during this interim period of visitation that the child shall not be removed from

the monastery grounds during the period of visitation with the natural father".

The defendant was then placed under oath, and questioned as to his understanding of the stipulation as follows:

"[The defendant's counsel]: Mr. Morel, have you heard the stipulation entered before this Court this morning?

"[The defendant]: I have.

"[The defendant's counsel]: And do you understand all the terms and conditions thereof?

"[The defendant]: Yes.

"[The defendant's counsel]: And are you in agreement with all the terms and conditions thereof?

"[The defendant]: Yes.

"[The defendant's counsel]: You understand that this is a temporary order without prejudice pending the trial of this action—

"[The defendant]: I understand.

"[The defendant's counsel]: (cont'g) Or further order of the Court?

"[The defendant]: Yes, sir.

"[The defendant's counsel]: And did anybody force you to make this agreement or are you doing this under your own free will and volition?

"[The defendant]: I'm doing this under my own free will."

After the defendant's wife similarly expressed her agreement with the stipulation under oath, the Supreme Court cautioned the parties as follows: "[THE COURT]: Now, I would point out to the parties that this stipulation is a legal agreement, binding on you both, and that you must live up to its terms".

During the defendant's exercise of visitation on March 6, 1988, he called the switchboard at Graymoor at 4:10 P.M. and stated to the operator that his wife's attorney had given him an extra hour of visitation on that date, that his wife should return home and not worry, and that he would return the child to her later. Subsequent investigation established that at 4:45 P.M. on that day the defendant flew to Santo Domingo with the child. The defendant's wife subsequently received communications from the defendant indicating that he would not return because he felt that American courts are unfair to fathers, and that he would be willing to return only if she gave him complete custody of Michael and relinquished her parental rights to him.

The terms of the parties' stipulation were later set forth in a judgment of the Supreme Court, Westchester County, dated March 15, 1988, awarding exclusive physical custody of the child to the defendant's wife pending trial of the custody issue. A subsequent judgment directed the defendant to return the child to her.

By Putnam County indictment No. 43/1988, dated April 22, 1988, the defendant was charged with custodial interference in the first degree, and a warrant for his arrest was issued upon his subsequent failure to appear for arraignment. It further appears that in or about April 1989 the defendant was apprehended in Florida and was returned to Putnam County to face the pending criminal charge. He subsequently moved, *inter alia,* to dismiss the indictment for insufficient evidence, contending that the elements of custodial interference in the first degree had not been made out because no order or judgment of the court granting his wife exclusive physical custody of the child was in existence at the time he removed the child from New York. In the order appealed from, the County Court granted that branch of his motion and dismissed the indictment. We reverse.

Insofar as relevant to the instant appeal, Penal Law § 135.50 defines custodial interference in the first degree as follows:

"A person is guilty of custodial interference in the first degree when he commits the crime of custodial interference in the second degree:

"1. With intent to permanently remove the victim from this state, he removes such person from the state".

Moreover, Penal Law § 135.45 defines custodial interference in the second degree in relevant part in the following manner:

"A person is guilty of custodial interference in the second degree when:

"1. Being a relative of a child less than sixteen years old, intending to hold such child permanently or for a protracted period, and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian".

The provisions of these statutes "must be construed according to the fair import of their terms to promote justice and effect the objects of the law" (Penal Law § 5.00). Hence, "conduct that falls within the plain, natural meaning of the language of [the statutes] may be punished as criminal" *(People v Ditta,* 52 NY2d 657, 660; *see,* McKinney's Cons Laws

of NY, Book 1, Statutes § 271 [c]). We find that the evidence of the defendant's acts adduced before the Grand Jury in this case falls squarely within the type of conduct which is prohibited by the plain and ordinary meaning of the foregoing statutes.

The clear object of Penal Law §§ 135.45 and 135.50 is to proscribe the use of self-help when a dispute as to child custody arises. To this end, the statutes speak not to the concept of custody in the broad sense, but to the narrow issue of *physical* custody only. The agreement entered into by the defendant and his wife in open court, the terms of which each swore under oath to obey, clearly placed exclusive physical custody of the child with the defendant's wife, subject only to limited and closely circumscribed visitation by him. There can be no doubt that the terms of the stipulation made the mother the "lawful custodian" (Penal Law § 135.45 [1]) of the child and required that the defendant forego the right to physical custody, subject only to his visitation rights. Moreover, there was ample evidence before the Grand Jury to sustain a finding that the defendant took the child from his lawful custodian while *"knowing* that he [had] no legal right to do so" (Penal Law § 135.45 [1] [emphasis supplied]), inasmuch as he acknowledged his own attorney's description of the stipulation placing physical custody with the mother as "a temporary order", and the Supreme Court instructed both parties that the stipulation constituted "a legal agreement, binding on you both, and * * * you must live up to its terms".

Likewise, there was sufficient evidence to support the Grand Jury's conclusion that the defendant's taking of the child was accompanied by an intent "to hold such child permanently or for a protracted period" (Penal Law § 135.45 [1]). Indeed, the testimony indicating that the defendant absconded with the 11-month old infant to Santo Domingo, coupled with his statements that he would not return and with his keeping of the child until his arrest approximately one year later, constitutes prima facie evidence of the intent element. Furthermore, the same evidence sustains the finding that he intended "to permanently remove the [child] from this state" (Penal Law § 135.50 [1]), thereby satisfying the additional aggravating circumstance necessary for custodial interference in the first degree.

Despite the foregoing evidence, the defendant maintains that the indictment against him cannot stand absent proof that a court order or judgment awarding physical custody of

the child to another existed at the time he took the child. We disagree. A reading of the clear and unambiguous language of the statutes in question demonstrates that they merely require proof that the defendant is a relative of a child under the age of 16, that he took the child from the person lawfully entrusted with physical custody without permission and knowing that he had no legal right to do so, that he engaged in this conduct with the intent to hold the child permanently or for a protracted period, and that he intended to remove the child from New York and did in fact so remove the child. Inasmuch as the evidence presented to the Grand Jury herein established that the defendant surrendered physical custody of the child to his wife except for a three-hour period each Sunday, that he knowingly took the child from her at a time other than that permitted by the agreement, and that he thereupon fled to Santo Domingo with the apparent intent to keep the child, all of the necessary elements of the crime of custodial interference in the first degree have been made out under the circumstances of this case. The statutes contain no additional requirement that a court order determining custody be in effect at the time of the taking of the child, nor is it the function of this court to engraft such a requirement on the clear terms of the statute. While the existence of a custody order at the time of the taking of a child is certainly useful in determining such issues as the respective legal rights of parties to the physical custody of the child, the identity of the child's lawful custodian, and whether the individual who took the child acted with knowledge that he or she lacked the legal right to do so, it is not an essential element to a prosecution under Penal Law §§ 135.45 and 135.50. In the case before us, the defendant's entry into the aforementioned stipulation, and the circumstances attendant thereto, fixed the legal rights of the defendant and his wife with respect to the physical custody of the child. Because this stipulation and the other evidence in the record is legally sufficient to support the charged offense, the order appealed from is reversed, on the law, that branch of the defendant's omnibus motion which was to dismiss the indictment is denied, the indictment is reinstated, and the matter is remitted to the County Court, Putnam County, for further proceedings consistent herewith.

BRACKEN, J. P., KOOPER, SULLIVAN and O'BRIEN, JJ., concur.

Ordered that the order is reversed, on the law, that branch of the defendant's omnibus motion which was to dismiss the indictment is denied, the indictment is reinstated, and the matter is remitted to the County Court, Putnam County, for further proceedings consistent herewith.